# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

UBS FINANCIAL SERVICES, INC.,

       Plaintiff,

v.

       **PRELIMINARY INJUNCTION**
       Civil File No. 13-1081 (MJD/JSM)

TYLER CHRISTENSON,

       Defendant.

Michael T. Roche, Schuyler Roche & Crisham PC, and Robert Bennett and Jeffrey S. Storms, Gaskins, Bennett, Birrell, Schupp, LLP, Counsel for Plaintiff.

Livia E. Babcock and Laura C. Sands, Meagher & Geer, PLLP, Counsel for Defendant.

## I. INTRODUCTION

This matter is before the Court on Plaintiff's Request for Expedited Hearing on Emergency Injunctive Relief Pursuant to Local Rule 7.1(d). [Docket No. 7] The Court heard oral argument on May 15, 2013. For the reasons that follow the Court grants the motion for a preliminary injunction, but modifies Plaintiff's requested relief to permit Defendant to inform his former clients of his new contact information.

1

### A.     Factual Background

### 1.     Defendant's Employment with UBS

Defendant Tyler S. Christenson ("Christenson") is a Minnesota resident and registered broker with the Financial Industry Regulatory Authority ("FINRA"), holding Series 7 and 63 security industry licenses and a Series 65 investment advisor license.  (Christenson Aff. ¶¶ 4-5.)  Christenson worked for Piper Jaffray from 1999 until 2005.  (Id.)

In September 2005, Christenson joined Defendant UBS Financial Services Inc. ("UBS") as a financial advisor.  (Christenson Aff. ¶¶ 2, 5.)  He joined as a partner to John Bloom, who was already a UBS advisor.  (Id. ¶¶ 6-7.)  Bloom and Christenson negotiated to operate as a team.  (Id. ¶ 7.)  They agreed that their already existing respective clients would become team clients under a team representative identification number.  (Id.)  Initially, Bloom would receive 80% of the commission and Christenson would receive 20% of the commission, but, over time, Christenson's percentage would increase to 40%.  (Id.)

### a)     2006 Team Agreement

After Christenson joined UBS, UBS required that he sign the Financial Advisor Team Agreement ("2006 Team Agreement").  (Christenson Aff. ¶ 9; Christenson Aff., Ex. 1, 2006 Team Agreement.)   The 2006 Team Agreement had

an effective date of January 1, 2006.  (Id.)  The agreement contains a one-year

non-solicitation clause, a confidentiality provision, and a mandatory arbitration

provision.  (2006 Team Agreement ¶¶ 8(A), 15, 19.)

### b)     RFAAs

After Christenson joined UBS, he was asked to sign a Receiving Financial

Advisor Agreement ("RFAA"), reflecting that if Christenson and a retiring UBS

advisor agreed, Christenson would buy the retiring advisor's book of business

over time, paying the retiring advisor a gradually decreasing share of

commissions earned on the book of business until the clients were transitioned to

Christenson.  (Christenson Aff. ¶ 17.)  He signed one RFAA on December 28,

2005, and another on October 31, 2006.   (Christenson Aff., Exs. 3-4.)  Bloom and

Christenson bought the books of two retiring advisors under their joint team

representative number.  (Christenson Aff. ¶ 18.)

### c)     2009 Team Agreement

After the make-up of the team changed, the 2006 Team Agreement was

replaced with a Team Agreement dated June 1, 2009, which superseded all prior

agreements.  (Christenson Aff., Ex. 2, 2009 Team Agreement ¶ 16.)  The 2009

Team Agreement also contained a non-solicitation clause, providing that

Christenson

> will not solicit, for a period of one year from the date of termination
> of the departing Team Member's employment, any clients of UBS
> Financial Services Inc. serviced by the Team; provided, however,
> that unless otherwise prohibited by a non-solicitation provision in
> another agreement, this provision does not apply to clients the
> departing Team Member introduced to the Team either at its
> inception or during its existence.

(2009 Team Agreement ¶ 11(A).)  The 2009 Team Agreement required Bloom and

Christenson to annually designate which team clients would be deemed to have

been introduced to the team by each of them.  (2009 Team Agreement ¶ 6.)

The agreement also contains a confidentiality non-disclosure provision,

applying to "nonpublic information concerning UBS Financial Services Inc.'s

financial data, strategic business plans, product development, customer lists,

customer financial information, marketing plans, and any other proprietary

information."  (2009 Team Agreement ¶ 21.)

The 2009 Team Agreement contained a mandatory arbitration clause;

however, the arbitration clause did not waive UBS's right to seek injunctive relief

from a court for violation of the non-solicitation or confidential information

clauses of the 2009 Team Agreement.  (2009 Team Agreement ¶¶ 17, 22.)

d)     **Change to Senior Wealth Strategy Associate Position**

In January 2010, UBS began to terminate low producers.  (Christenson Aff.

¶ 21.)  Bloom told Christenson that his production was too low, and that, in order

to avoid termination, he should move to the position of Senior Wealth Strategy

Associate.  (Id. ¶ 22.)  Bloom promised Christenson would be salaried, but he

would receive a bonus based on the revenue generated by the team clients, and

his annual compensation would still be a percentage of the team revenue – in fact

it would be 35%.  (Id. ¶ 22.)  Christenson claims that Bloom represented that,

besides the change to compensation, nothing else in their relationship or

Christenson's relationship with customers would change.  (Id.)

Christenson alleges that, in reliance on Bloom's representations, he agreed

to the change.  (Christenson Aff. ¶ 23.)  Christenson avers that he did not sign

any documents associated with the change, and he was not advised that the

change would terminate his producer status.  (Id. ¶ 23.)  Christenson's duties and

interactions with clients did not change.  (Id. ¶ 24.)

e)     **The End of Christenson's Relationship with UBS**

In early 2013, UBS branch manager Roger Burton met with Christenson for

his review, criticized his performance, and presented him with a lower

compensation package.  (Christenson Aff. ¶¶ 28-29.)  Christenson began

considering leaving UBS to join another firm.  (Id. ¶ 31.)

On May 2, 2013, before Christenson made a final decision to leave UBS,

Burton called him into another meeting.  (Christenson Aff. ¶ 31.)  Christenson

was suspicious when he got the meeting invitation, so he prepared a resignation

letter and a list of team clients with whom he worked.  (Id.)  At the meeting,

Burton told him that UBS was moving him to administration and would need to

move out of his office into a cubical.  (Id.)  He ordered Christenson to sign a

document agreeing to various changes in his position and refused to allow

Christenson to leave with the document or to review it with anyone.  (Id.)

Christenson refused to sign and resigned.  (Id.)  Christenson avers that, before he

resigned, he did not tell any clients that he was leaving UBS; nor did he solicit

them.  (Id. ¶ 32.)

After resigning, Christenson became a registered representative with LPL

Financial and an independent contractor advisor with Investors Financial Group

("IFG").  (Gaarder Aff. ¶ 3.)  In connection with his resignation from UBS,

Christenson admits that he prepared and took a list of his clients and their basic

contact information.  He provided a copy of the list to UBS.  (Christenson Aff. ¶ 33.)

### 2.    The Protocol for Broker Recruiting

UBS and LPL are signatories to the Protocol for Broker Recruiting. (Babcock Aff., Ex. A, Protocol for Broker Recruiting ("Protocol").)  Under the Protocol, a registered representative moving from one Protocol firm to another may take "the client name, address, phone number, email address, and account title of the clients that they serviced while at the firm."  (Protocol at 1.)   The registered representative may freely solicit his former clients.  (Id.)  If a registered representative is a member of a team and leaves, any written team agreement governs; however, in no event will the registered representative be precluded from soliciting those clients that he introduced to the team.  (Id. at 2.)  If no written agreement exists, then a registered representative who has been a member of the team for four or more years may solicit all team clients.  (Id.)

### 3.    Clients at Issue

#### a)    Clients Christenson Will not Solicit

Christenson agrees that he will not try to solicit team clients that worked more closely with Bloom than with him, and he did not include such clients on the client list that he took from UBS.

### b)     Clients UBS Agrees Christenson Can Solicit

UBS and Christenson agree that Christenson may solicit clients included in the 2005 list of clients introduced by Christenson that is attached to the 2006 Team Agreement.  UBS also agrees that Christenson may solicit clients that he introduced to the team while he was a financial advisor.

### c)     Disputed Clients

Twelve clients were joint clients of the Bloom Group team that were served by and worked with Christenson.  Christenson seeks to solicit these clients, and UBS contends that he cannot.  Fifty-six clients are clients that the Bloom Team purchased from two retired advisors.  Christenson seeks to solicit these clients, and UBS contends that he cannot.  These sixty-eight clients are referred to as the Disputed Clients.

### B.     Procedural Background

UBS filed a Complaint against Christenson in this Court on May 8, 2013. The Complaint alleges Count 1: Breach of Contract – Christenson's Breach of the

Team Agreement; Count 2: Breach of Contract – Christenson's Breach of the

RFAAs; Count 3: Breach by Christenson of Fiduciary Duties Owed to UBS; and

Count 4; Unfair Competition.

On May 9, UBS filed this current motion for emergency injunctive relief.

UBS requests that the Court enter a preliminary injunction pending resolution of

this matter by a FINRA arbitration panel.  It asks that the Court enjoin

Christenson from soliciting any clients that he did not introduce to UBS, bar him

from using any information regarding UBS clients, and require him to return all

confidential information to UBS.

## II.    DISCUSSION

### A.    Standard for a Preliminary Injunction

The Eighth Circuit Court of Appeals has established the standard for

considering preliminary injunctions.  Dataphase Sys. Inc. v. CL Sys., Inc., 640

F.2d 109, 113 (8th Cir. 1981) (en banc ).  This Court must consider (1) the threat of

irreparable harm to the moving party if an injunction is not granted, (2) the harm

suffered by the moving party if injunctive relief is denied as compared to the

effect on the non-moving party if the relief is granted, (3) the public interest, and

(4) the probability that the moving party will succeed on the merits.  Id.

### B.    Probability of Success on the Merits

## 1.   Application of the Protocol

Christenson argues that UBS cannot enforce the non-solicitation provisions in the Team Agreements or the RFAAs based on the Protocol.  The Court concludes that it is likely that the Protocol does not apply here because the Protocol does not supersede a written financial advisor team agreement.  Instead, it explicitly provides that the ability to take contact information and solicit clients subject to those agreements is controlled by the terms of those written agreements.  Because it is likely that a valid team agreement exists here, the Protocol is unlikely to apply.

## 2.   Breach of the RFAAs

The Court concludes that UBS is not likely to succeed on its claim that Christenson breached the RFAAs.  Section 4(a) of the RFAA prohibits the Receiving Financial Advisor – Christenson – from soliciting, accepting or conducting business, disclosing Customer information, or otherwise doing business or dealing with Customers of Received Accounts "at any time." (Christens Aff., Exs. 3-4 ¶ 4(a).  However, Section 4(e) states that Section 4's restrictions only apply so long as Christenson is employed by UBS:

> Except as set forth in the following paragraph, the terms of this
> Section 4 shall remain in effect at all times during which Receiving

FA is in the employ or retained as an independent contractor or consultant of the Firm, including any successors of the Firm.

(Id. ¶ 4(e).)  Given that the two sections appear to contradict one another, the Court interprets the contract in a way that harmonizes the two sections by interpreting the 4(a) restrictions to apply at any time, so long as Christenson is still employed by or associated with UBS.  This interpretation is also supported by Minnesota law requiring an ambiguous contract to be construed against the drafting party, here, UBS.  Moreover, UBS's interpretation – that the restrictive covenant in Section 4 applies forever – is unreasonable, and Minnesota law requires restrictive covenants to be reasonable as to geographic scope and duration.  Also, UBS's interpretation is extremely broad, and would bar Christenson from accepting a client's attempt to transfer his account to him, in violation of FINRA Rules.  Thus, the Court concludes that it is likely that the RFAAs' restrict covenant provisions do not apply Christenson at this time.

### 3.    Breach of the Team Agreements

The Court finds that UBS is likely to succeed on the merits of its claim of breach of the Team Agreements because it appears that Christenson took contact information for clients that he admittedly did not introduce to the team with the

stated intention of soliciting those clients.  The Court further concludes that it is

likely that the Team Agreements will be deemed enforceable.

### a)      Enforceability of the Team Agreements

Christenson argues that the 2006 Team Agreement is unenforceable for

lack of consideration because he was required to sign that agreement after he had

already started working for UBS.  See, e.g., Overholt Crop Ins. Service Co. v.

Travis, 941 F.2d 1361, 1368 (8th Cir. 1991) ("Minnesota requires independent

consideration when a restrictive covenant is entered into after an individual has

begun working for an employer.").  UBS argues that there was sufficient

consideration for the 2006 Team Agreement because Christenson gained an

independent benefit from the agreement – the right to share in Bloom's clients

and commissions.  At this very early stage of the litigation, it appears likely that

there was sufficient consideration for the 2006 Team Agreement in the form of

access to commissions from Bloom's clients.

Christenson notes that, although the 2009 Team Agreement provided that

Bloom and Christenson were supposed to create lists of team clients, identifying

who introduced the client, no list was made.  He concludes that, because no list

was made, the 2009 Team Agreement does not address Christenson's ability to

solicit clients that have not been properly designated and the Protocol applies.

At this early stage of the proceedings, it appears that there is no dispute

regarding which clients Christenson introduced to the team, so the failure of

Bloom and Christenson to prepare the required lists is not a material breach of

the contract.

### b)      Solicitation

Christenson now represents that he is amenable to agreeing that he will

not solicit the clients in dispute; however, he would like to simply send an

announcement to them with his new contact information.  The Court agrees that

this solution is supported by the facts and case law.

The Team Agreements, which are likely enforceable, bar Christensen from

soliciting clients that he did not introduce to the team for one year.  Specifically,

they bar Christenson from directly or indirectly initiating "any contact or

communication, of any kind whatsoever, for the purpose of inviting,

encouraging or requesting a client, or that may have the effect of inviting,

encouraging or requesting a client . . . to transfer his or her [UBS] account(s) to

the departing Team Member or his or her new employer."  (2006 Team

Agreement ¶8(c); 2009 Team Agreement ¶ 11(c).)  Thus, Christenson is barred

from solicitation.  However,  there is a difference between soliciting and

contacting.  The Team Agreements do not bar all contact.  The Court concludes

that a neutral announcement of Christenson's new employer and contact

information to the former clients with whom Christenson worked, and who are

listed on the Protocol list that Christenson provided to UBS, is permissible and

reasonable.  See, e.g., Wells Fargo Investments, LLC v. Bengtson, No. 0:07-cv-

3192 (MJD/AJB), 2007 WL 2007997, at *2 (D. Minn. July 9, 2007); Wells v. Merrill

Lynch, Pierce, Fenner & Smith, Inc., 919 F. Supp. 1047, 1053 (E.D. Ky. 1994).  This

announcement must not encourage clients to leave UBS; nor may it tout

Christenson's new employer.

### c)      UBS's Confidential Information

UBS claims that Christensen possesses client information beyond Protocol

information, such as specific information regarding finances.  While Christensen

may retain the Protocol information regarding the former clients that he listed on

the Protocol list provided to UBS, in order to provide a generic announcement to

those clients, he may not possess or reveal any other confidential client

information.

14

### 4.   Breach of Fiduciary Duty

There is no evidence that Christenson solicited clients before his

employment with UBS ended.  Thus, UBS is unlikely to succeed on a claim that

he breached his fiduciary duty to UBS.

### 5.   Unfair Competition

There is no evidence that Christenson solicited clients before his

employment with UBS ended.  Additionally, Christenson provided UBS with a

list of clients that he intended to contact, so UBS was immediately able to

compete for their business.  UBS has not shown that it is likely to succeed on a

claim of unfair competition.

### C.   Threat of Irreparable Harm

UBS faces the threat of irreparable harm to its good will and client

relationships if Christenson solicits clients he is not entitled to solicit.  See

Benfield, Inc. v. Moline, 351 F. Supp. 2d 911, 918 (D. Minn. 2004).  Additionally,

the release of confidential client information will cause irreparable harm because,

once shared, that private information cannot be "un-shared."

### D.   Balance of the Harms

Without the injunction, UBS is unable to enforce its bargained-for benefits,

and could unfairly lose clients and confidential information.  This harm is

15

significant.  However, given the size of UBS, this harm would not be catastrophic

to it.  With an injunction, Christenson will be held to the contracts to which he

agreed.  However, he faces losing clients and, therefore, income, which could be

a significant financial harm.  The harm to Christensen, UBS, and the clients is

minimized if Christensen is held to his obligations to not solicit and to return any

confidential information, yet Christenson's former clients receive a neutral

announcement that their former advisor has new contact information.

### E.    Public Interest

The public has an interest in enforcing contracts, including covenants not

to compete.  Additionally, the public has an interest in allowing consumers to

choose the advisor with whom they would like to do business, an interest

acknowledged by FINRA Rules.  By granting the preliminary injunction, yet

allowing Christenson to inform his former clients of his whereabouts, the Court

balances these two competing public interests.

Accordingly, based upon the files, records, and proceedings herein**, IT IS**

**HEREBY ORDERED**:

Plaintiff's Request for Expedited Hearing on Emergency Injunctive
Relief Pursuant to Local Rule 7.1(d) [Docket No. 7] is **GRANTED IN
PART** and **DENIED IN PART** as follows:

16

1.     Defendant Tyler S. Christenson ("Christenson" or "Defendant") is immediately enjoined and restrained, directly or indirectly, and whether alone or in concert with others, including any officer, agent, representative, and/or employee of his new employer, Investors Financial Group, LLC, or its clearing firm, LPL Financial, from soliciting any business from any client serviced by John Bloom or the Bloom Wealth Management Group during Christenson's prior employment with UBS other than those clients that Christenson introduced. Defendant may send a neutral announcement of his change in employer and new contact information to the Disputed Clients.

2.     Defendant is further enjoined and restrained, directly or indirectly, and whether alone or in concert with others, including any officer, agent, representative, and/or employee of his new employer, Investors Financial Group, LLC , or its clearing firm, LPL Financial, until such time as an expedited arbitration is held on UBS' claim for permanent injunctive relief as provided under FINRA Rules from:

   A.     Using, disclosing, or transmitting for any purpose (including but not limited to solicitation of said clients), any information contained in the records of UBS relating to all customers introduced to Christenson by Bloom under their Financial Advisor Team Agreement and/or customers Christenson serviced or assisted the Bloom Wealth Management Group in servicing during his employment with UBS but did not introduce, with the exception that he may retain the Protocol approved information on the Disputed Clients in order to use that information to send a neutral announcement of his change in employer and new contact information to those Disputed Clients; and

B.     Destroying, erasing, or otherwise making unavailable for further proceedings in this matter, or in any arbitration proceeding between the parties, any records or documents (including data or information maintained in computer, electronic, or digital media) in his possession or control which were obtained from or contained information derived from any UBS records, which pertain to clients Christenson served or whose names became known to him while employed by UBS, or which relate to any of the events alleged in the Complaint in this action.

3.     Defendant, and anyone acting in concert or participation with him, specifically including his counsel and any agent, employee, officer or representative of Investors Financial Group, LLC and/or LPL Financial, LLC is further ordered to return to UBS's counsel any and all records, documents and/or other types of information pertaining to UBS customers ("Customer Information"), whether in original, copied, handwritten, computerized (including computer software, disks, computer hard drive and/or any other type of computer or digital information storage devices) or memorialized in any other form, within twenty-four (24) hours of notice to Defendant or his counsel of the terms of this Order, with the exception that Defendant may retain the Protocol approved information on the Disputed Clients in order to use that information to send a neutral announcement of his change in employer and new contact information to those Disputed Clients.  Additionally, Defendant may retain the Protocol information on the clients that both parties agree Defendant is permitted to solicit.  Defendant's counsel is permitted to keep a copy of the returned Customer Information for "attorneys' eyes only" for use in defending this proceeding and/or in arbitration before FINRA Dispute Resolution.

4.      Any and all Customer Information within Defendant's possession, custody or control that is contained in any computerized electronic or digital form, including on computer software, disks, computer hard drive, and/or any other type of computer or digital information software device, returned pursuant to Paragraph 3 above shall be permanently deleted by a UBS representative.  Defendant, and anyone acting in concert with him, is precluded from reconstituting or in any way restoring any Customer Information deleted pursuant to this paragraph and returned to UBS pursuant to Paragraph 3 above.

5.      Pursuant to § 13804 of the FINRA Code of Arbitration Procedure and §§ 3 and 4 of the Federal Arbitration Act, the parties are directed to proceed toward expedited arbitration on the merits of the controversy before a full Panel of arbitrators.

6.      This Order shall be effective upon the posting of a bond by UBS in the amount of $1,000 and shall last until the completion of FINRA arbitration of UBS' claim for permanent injunctive relief.

Dated:   May 15, 2013                    s/ Michael J. Davis                                      
                                         Michael J. Davis
                                         Chief Judge
                                         United States District Court

19